IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Robert Carlton,<br><br>    Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>    Defendant. | Case No. 8:23-cv-211<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Carlton ("Carlton") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA").

**PRELIMINARY STATEMENT**

1.      Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her

position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2. In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3. Carlton is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified for and safely performing his job without incident, Carlton was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Carlton was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1), because Defendant is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to Defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, because Plaintiff would have worked in Nebraska but for Defendant's unlawful employment practices, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7. Carlton resides in Oshkosh, Nebraska. He was an employee of Union Pacific, working in Oshkosh, Nebraska.

8. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in Oshkosh, Nebraska, and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels as "Reportable Health Events" (Exhibit A.) This includes but is not limited to a seizure of any kind and treatment with anti-seizure medication to prevent seizures.

11. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee to Health and Medical Services based on a belief that an employee may have such a health condition.

12. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13. When a Fitness-For-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

4

(Exhibit A.)

14. These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

17. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department, located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18. Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19. The Health and Medical Services Department also uses discriminatory qualification standards, tests, and/or other criteria to exclude individuals with disabilities from their positions.

20. When issuing Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain broad

categories of health conditions or treatments, and assigns standardized work restrictions to employees.

21. For example, as part of these standardized protocols, the Health and Medical Services Department regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("2014 Medical Examiner's Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place.

22. Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

25. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

26. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

27. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner Handbook was reliable guidance and supported its decisions to impose standardized work restrictions for its employees. For example:

   a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

   b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

   c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018 at 6, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost

their livelihoods.

### *PLAINTIFF ROBERT CARLTON*

30. Carlton was hired by Union Pacific in November 1992.

31. Most recently, Carlton worked for Union Pacific as a Foreman General (Level I) in Oshkosh, Nebraska, overseeing a Rapid Response Mechanical team. Previously, Carlton worked as a Mechanic's Helper, a Journey Mechanic, a Supervisor, and a Foreman General (Level I) for Union Pacific in North Platte, Nebraska.

32. On approximately February 13, 2016, Carlton had a seizure while at home in his sleep.

33. Carlton sought medical treatment, and Carlton's treating doctors cleared him to return to work with a temporary 30-day driving restriction.

34. Carlton reported this event to Union Pacific. On February 16, 2016, Union Pacific sent Carlton a letter instructing him to take a 6-month leave of absence until August 15, 2016. The letter also notified Carlton that he would be subject to a Fitness-For-Duty review prior to returning to work.

35. In approximately April 2016, while on the leave of absence, Carlton had another seizure, also while at home in his sleep. During this seizure, Carlton dislocated his shoulder. His shoulder was further damaged when doctors at the hospital relocated it, resulting in the need for surgery to repair Carlton's rotator cuff.

36. Following these incidents, Carlton's doctors prescribed anti-seizure medication. Carlton has taken anti-seizure medication since that time.

37. Carlton had no prior history of seizures before these two seizures and has not experienced another seizure since.

38. In approximately July 2016, Carlton's neurologist cleared him to return to work without restrictions.

39. On July 27, 2016, Union Pacific sent Carlton a letter extending his medical leave of absence to February 28, 2017. The letter again notified Carlton that he would be subject to a Fitness-For-Duty review prior to returning to work.

40. In approximately late summer or early fall of 2016, Union Pacific dissolved the Rapid Response Mechanical team in Oshkosh, Nebraska. Carl Spearman, then-Manager of Locomotive Maintenance, offered Carlton a Foreman General I position in Sidney, Nebraska, overseeing the Rapid Response Mechanical team there.

41. Carlton accepted the position, understanding that he would soon be returning to work upon receiving medical clearance for his shoulder. Upon information and belief, Union Pacific placed someone else in the position on a temporary basis until that time.

42. Carlton's medical providers who were treating his shoulder cleared him to return to work without restrictions on October 25, 2016.

43. On October 6, 2016, and October 28, 2016, Union Pacific sent Carlton additional letters notifying him that he would be subject to a Fitness-For-Duty review prior to returning to work. The letters requested medical records pertaining to both his seizures and shoulder surgery.

44. Carlton submitted the requested medical records to Union Pacific.

45. On November 5, 2016, Dr. Matthew Hughes, one of Union Pacific's Associate Medical Directors, wrote a Fitness-For-Duty Determination Memo. The memorandum noted that Carlton was evaluated for "return to work clearance for rotator

cuff repair when he was discovered to have new onset seizure disorder."

46.     Dr. Hughes imposed the following work restrictions on Carlton on the basis that he was at risk for sudden incapacitation:

- Not to operate company vehicles, on-track or mobile equipment, or fork-lifts. (Clarification: not to operate golf carts, ATVs, etc.)

- Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers. (Clarification: May work on stationary locomotives outside of the blue flag zone, if working with another employee and following normal safety rules)

- Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.

- Not to work at unprotected heights over 4 feet above the ground. (Clarification: May ascend stairs and ladders on locomotives in shops, following normal safety rules).

- Not to perform work where decisions or actions can affect the safety of others (not to work as a Train Dispatcher or similar safety sensitive positions).

47.     Dr. Hughes stated the restrictions could be reviewed in August 2026 or 10 years after discontinuation of anti-seizure medication.

48.     Upon information and belief, in imposing these unnecessary and unwarranted restrictions on Carlton, Union Pacific relied on guidance from the outdated FMCSA Medical Examiner Handbook and the "1% rule."

49.     No doctor affiliated with Union Pacific ever physically examined Carlton.

50.     Upon information and belief, Union Pacific did not consult with Carlton's

treating providers.

51. Instead, upon information and belief, Union Pacific issued the restrictions based on a medical file review it performed or commissioned.

52. Union Pacific removed Carlton from service and issued the restrictions in direct disregard of Carlton's treating medical providers who had cleared him to return to work.

53. On November 23, 2016, Union Pacific's Health and Medical Services Department issued a "Status Update" stating Carlton's restrictions were permanent.

54. On December 5, 2016, Union Pacific sent Carlton a letter stating that his supervisor was unable to accommodate the work restrictions it had imposed.

55. Because of these restrictions, Union Pacific did not allow Carlton to return to a Foreman General I position.

56. Union Pacific also did not permit Carlton to return to work in a different position. Carlton sought employment with Union Pacific's Car Department and Locomotive Department but was denied by both departments. Carlton offered to take a demotion to a line supervisor position, but his request was denied by Union Pacific.

57. Carlton remains capable of working as a Foreman General, as a Supervisor, and in all of his other previous positions with Union Pacific to this day.

58. On February 19, 2016, counsel for Carlton, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

59. Because he was a class member in the *Harris* case, Carlton's disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

60. This Court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

61. As a result of *Crown Cork* tolling, Carlton had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Carlton's and other class members' claims by an additional sixty (60) days. Carlton timely filed a charge of discrimination with the EEOC on April 10, 2020. On May 22, 2023, the EEOC issued a right-to-sue letter. Carlton now timely initiates the present lawsuit.

### CAUSES OF ACTION

### COUNT I
### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

62. Carlton incorporates the foregoing paragraphs by reference.

63. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

64. At all relevant times, Carlton was an individual with a disability as defined by the ADA.

65. At all relevant times, Carlton had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

66. Section 12112(a) of the ADA prohibits employers from discriminating against qualified individuals on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

67. Union Pacific discriminated against Carlton on the basis of disability by, among other things, removing him from service because of a disability.

68. Because Union Pacific violated 42 U.S.C. § 12112, Carlton has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Carlton is also entitled to attorneys' fees and costs incurred in connection with these claims.

69. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Carlton and others similarly situated. As a result, Carlton is entitled to punitive damages.

## COUNT II
### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

70. Carlton incorporates the foregoing paragraphs by reference.

71. " '[D]iscriminat[ing] against a qualified individual on the basis of disability' includes…using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless

the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

72. Union Pacific discriminated against Carlton on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Carlton.

73. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

74. Because Union Pacific violated 42 U.S.C. § 12112, Carlton has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Carlton is also entitled to attorneys' fees and costs incurred in connection with these claims.

75. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Carlton and others similarly situated. As a result, Carlton is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff Robert Carlton prays for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in

concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Carlton's costs, disbursements and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

Date: May 23, 2023         **NICHOLS KASTER, PLLP**

s/*Caitlin L. Opperman*
James H. Kaster* (MN # 53946)
    kaster@nka.com
Lucas J. Kaster* (MN # 396251)
    lkaster@nka.com
Caitlin L. Opperman* (MN # 0399978)
    copperman@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

*Admitted in D. Neb.

**ATTORNEYS FOR PLAINTIFF**