IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ROBERT CARLTON,

          Plaintiff,

     vs.

UNION PACIFIC RAILROAD CO.,

          Defendant.

NO. 8:23-CV-0211

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

Plaintiff Robert Carlton has sued his former employer defendant Union Pacific Railroad Company under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Filing 1. Carlton is a former member of the now-decertified *Harris* class that sued Union Pacific for violations under the ADA. Filing 1 at 12 (¶ 59); *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030 (8th Cir. 2020). Carlton brings two claims under the ADA against Union Pacific alleging disability discrimination due to disparate treatment. Filing 1 at 12–14 (¶¶ 62–75). Defendant seeks to dismiss Count II of the Complaint and parts of other claims. Filing 6. Plaintiff seeks oral argument on the Motion to Dismiss. Filing 12. For the reasons stated herein, the Court grants Defendant's Motion to Dismiss and denies Plaintiff's Motion for Oral Argument.

## I.  INTRODUCTION

### A.  Factual Background

On a Motion to Dismiss, the facts are drawn from the Complaint. See *Zutz v. Nelson*, 601 F.3d 842, 846 (8th Cir. 2010). Robert Carlton worked for Union Pacific between November 1992

1

and February 2016. Filing 1 at 8 (¶¶ 30, 34). On or around February 13, 2016, Carlton suffered a seizure at home in his sleep. Filing 1 at 8 (¶ 32). After Carlton reported the seizure, Union Pacific instructed him to take a six-month leave of absence and informed him that he must undergo a Fitness-for-Duty (FFD) evaluation before returning to work. Filing 1 at 8 (¶ 34). After this first seizure, Carlton sought medical treatment and received medical clearance to return to work with a 30-day driving restriction. Filing 1 at 8 (¶ 33). In April 2016, while he was on medical leave of absence, Carlton suffered another seizure during which he dislocated his shoulder and was hospitalized. Filing 1 at 8 (¶ 35). After this second seizure, Carlton was prescribed anti-seizure medication and had not had a seizure as of the date of the filing of the complaint. Filing 1 at 8 (¶ 36). Carlton's neurologist cleared him to return to work without restrictions on or around July 2016, approximately three months after his second seizure. Filing 1 at 9 (¶ 38).

Union Pacific requested Carlton's medical records to conduct his FFD evaluation. Filing 1 at 9 (¶ 43). No doctor at Union Pacific physically examined Carlton or consulted with doctors who treated his seizures or shoulder. Filing 1 at 10–11 (¶¶ 49–51). Relying on Carlton's medical records, a doctor for Union Pacific conducted Carlton's FFD evaluation and concluded that Carlton had "new onset seizure disorder."[1] Filing 1 at 9–10 (¶ 45). The Union Pacific doctor then "imposed . . . work restrictions on Carlton on the basis that he was at risk for sudden incapacitation." Filing 1 at 10 (¶ 46). Initially, the restrictions could not be reviewed until 2026 or ten years after Carlton stopped taking anti-seizure medication, but the restrictions were later updated to be permanent. Filing 1 at 10–11 (¶ 47, 53). Carlton's supervisor determined that Carlton's work restrictions could not be accommodated for his position as a Foreman General or for several other positions and

---

[1] Carlton does not allege in the Complaint that he has or ever had "new onset seizure disorder."

accordingly removed him from service. Filing 1 at 11 (¶¶ 54–56). Despite this, Carlton alleges that he "could perform the essential functions of his position with or without reasonable accommodations" and "remains capable of working . . . in all of his previous positions with Union Pacific to this day." Filing 1 at 11, 13 (¶ 57, 65).

Carlton alleges that he experienced disability discrimination due to Union Pacific's FFD policy. Filing 1 at 14 (¶ 72). The FFD policy applies "to all Union Pacific employees across the country." Filing 1 at 3 (¶ 9). "Fitness for Duty" is defined in Union Pacific's Medical Rules as "[a]bility to medically and functionally (including physical, mental, and/or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws." Filing 1-1 at 12. The FFD policy requires that "[i]f the employee experiences a [reportable] health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by [Union Pacific's Health and Medical Services Department (HMS)]." Filing 1-1 at 3. "Reportable health events" include diabetes, a "seizure of any kind," heart attacks, and "[n]ew use of hearing aids." Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep Apnea"). The employee must also "[p]rovid[e], upon request, information from the employees [sic] health care provider." Filing 1-1 at 3. After receiving an employee's medical records, HMS "conducts a 'file review' and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty." Filing 1 at 5 (¶ 17).

HMS relies on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook to conduct FFD Evaluations, specifically "to determine which health

conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place." Filing 1 at 6 (¶ 21). Carlton alleges that the Handbook "did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce." Filing 1 at 6 (¶ 23). He also alleges that, by 2015, HMS "learned" that the Handbook was "outdated" but continued to rely on it in its Medical Rules. Filing 1 at 6 (¶ 25).

Carlton also alleges that Union Pacific has unwritten "related policies" not in its Medical Rules that are also discriminatory. Filing 1 at 14 (¶ 72). These policies include a "1% rule" that Union Pacific "used to disqualify from service any employee who it believed had epilepsy, seizures, or a seizure risk, on the basis that they posed a greater than 1% risk for sudden incapacitation." Filing 1 at 4 (¶ 12). Carlton alleges that the "1% rule" was also instituted in reliance on the FMCSA Handbook. Filing 1 at 7 (¶ 27).

### B.  Procedural Background

Prior to this suit, Carlton joined a class action suit (*Harris*) against Union Pacific alleging disability discrimination under the ADA. Filing 1 at 12 (¶ 59). An Amended Complaint was filed on behalf of the class in the District Court for the Western District of Washington on February 19, 2016. Filing 1 at 11 (¶ 58); *Harris v. Union Pacific R.R. Co.*, No. 16-381 (D. Neb. Feb. 19, 2016), ECF No. 20. The Amended Complaint described the class as:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

Case No. 16-381, ECF No. 20 at 17 (¶ 116). Among the many Counts asserted in the Amended Complaint were a disparate-treatment claim pursuant to 42 U.S.C. § 12112(a) and (b)(6), a

disparate-impact claim pursuant to 42 U.S.C. § 12112(b)(6) and (b)(3), an unlawful-medical-inquiries claim pursuant to 42 U.S.C. § 12112(d)(4)(A), and a failure-to-accommodate claim pursuant to 42 U.S.C. § 12112(b)(5)(A). Case No. 16-381, ECF No. 20 at 21–25 (¶¶ 136–163).[2] The case was then transferred to this Court. Case No. 16-381, ECF No. 51 at 3.

The *Harris* plaintiffs sought class certification for their disparate-treatment claim but not on their disparate-impact, unlawful-medical-inquiries, or failure-to-accommodate claims before a different judge of this Court. Case No. 16-381, ECF No. 241 at 22. When seeking certification, the plaintiffs described the class as "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." Case No. 16-381, ECF No. 240 at 1. The class was certified in February 2019. *See* Case No. 16-381, ECF No. 307; *Harris v. Union Pac. R.R. Co.*, 2020 WL 4504392, at *1 (D. Neb. Aug. 5, 2020). The Eighth Circuit Court of Appeals reversed and decertified the class on March 24, 2020. *Harris*, 953 F.3d 1030. Carlton promptly filed a charge of discrimination with the EEOC on April 10, 2020, and the EEOC issued a right-to-sue letter on May 22, 2023. Filing 1 at 12 (¶ 61). Carlton filed a Complaint against Union Pacific with the Court on May 23, 2023. Filing 1.

Carlton alleges two counts of disability discrimination on disparate-treatment theories under the ADA. Count I asserts a claim under 42 U.S.C. § 12112(a), alleging that "Union Pacific discriminated against Carlton on the basis of disability by, among other things, removing him from

---

[2] The plaintiffs in *Harris* brought other claims, *see* Case No. 16-381, ECF No. 20, but only their ADA claims are of interest in Carlton's lawsuit.

service because of a disability." Filing 1 at 13 (¶ 67). Count II asserts a claim under § 12112(b)(6), alleging:

> Union Pacific discriminated against Carlton on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Carlton.

Filing 1 at 14 (¶ 72). In his prayer for relief, Carlton asks for monetary damages and other forms of relief, including an injunction to enjoin Union Pacific's policies. Filing 1 at 14–15.

On June 15, 2023, Union Pacific filed its Motion to Dismiss. Filing 6. Union Pacific seeks dismissal of any claim based on Carlton having an "actual disability" or a "record of disability" as defined by the ADA. Filing 6 at 1. Union Pacific also seeks dismissal of any claim that Union Pacific failed to grant Carlton a "reasonable accommodation" as required by the ADA. Filing 6 at 1. Union Pacific does not otherwise challenge Count I of Carlton's Complaint. *See generally* Filing 6. On the other hand, Union Pacific argues that Count II of Carlton's Complaint, although styled as a disparate-treatment claim, is actually a disparate-impact claim that is time-barred and must be dismissed. Filing 6 at 1.

## II. ANALYSIS

### A. Applicable Standards

The typical grounds for Rule 12(b)(6) motions are the insufficiency of the factual allegations offered to state claims. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, "'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, as the Eighth

Circuit Court of Appeals has explained, "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 680-83). To put it another way, a court "must determine whether a plaintiff's complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting *Braden v. WalMart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). Thus, "[a] claim is plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Christopherson v. Bushner,* 33 F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). In contrast, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks and citations omitted). The Eighth Circuit Court of Appeals has cautioned that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.

In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)). On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a

7

pleader's "legal conclusions drawn from the facts." *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 755 (8th Cir. 2021).

Rule 12(b)(6) also permits dismissal when a claim is not cognizable under applicable law. See, e.g., *Couzens v. Donohue*, 854 F.3d 508, 517 (8th Cir. 2017) (dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); *Thomas v. Bd. of Regents of Univ. of Nebraska*, No. 4:20CV3081, 2022 WL 1491102, at *18 (D. Neb. May 11, 2022) (agreeing with defendant that the plaintiffs had failed to state a claim, because a disparate-impact claim is not cognizable under the Equal Protection Clause); *Freeney v. Galvin*, No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (finding the plaintiff failed to state a § 1983 claim against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents). In such cases, the plaintiff failed to state a claim that was legally cognizable as opposed to factually plausible.

### B.  Preliminary Matters

The Court begins with two preliminary matters. First, Carlton requested oral argument. Filing 12. Defendant's request for oral argument is denied as the Court does not hold oral arguments on straightforward motions to dismiss.

Second, both parties addressed a non-existent "failure-to-accommodate" claim in their briefs. Filing 7 at 21–23; Filing 10 at 20–21; Filing 13 at 12–14. Both parties agree that Carlton's Complaint did not allege a "failure-to-accommodate" claim. Filing 7 at 21; Filing 10 at 20. Thus, to the extent that Carlton's claim is for failure to accommodate, the claim is dismissed.

The true argument between the parties is not over whether the Court should dismiss a "failure-to-accommodate" claim that is not in the Complaint but whether evidence on

accommodations is "relevant to a defendant's direct threat affirmative defense." Filing 10 at 20; Filing 13 at 12. Carlton contends that evidence on accommodations is relevant because "reasonable accommodations must be made for otherwise qualified individuals who are actually disabled or have a record of impairment." Filing 10 at 21 (citing 29 C.F.R. § 1630.2(o)(54)). He also argues that nothing requires that "a plaintiff must have a separate failure-to-accommodate claim for accommodations to be relevant to the question of whether a plaintiff is qualified or poses a direct threat." Filing 10 at 21. Union Pacific responds that Carlton seeks to introduce failure-to-accommodate evidence to "resurrect his accommodation claim" and "impos[e] the burden on Union Pacific to prove there was no accommodation available to mitigate the direct threat." Filing 13 at 12–13 (capitalization removed).

The Eighth Circuit has referenced EEOC regulations to establish that there is no duty to accommodate someone who is merely "regarded as" disabled:

> A person is disabled for purposes of an accommodation claim if he or she has "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual" ["actual" disability] or has "record of such an impairment." 29 C.F.R. § 1630.2(g)(1)(i) and (ii). *See also* 29 C.F.R. § 1630.2(o)(4) (providing that a covered entity "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong (paragraph (g)(1)(iii) of this section)").

*Hustvet v. Allina Health Sys.*, 910 F.3d 399 (8th Cir. 2018). Because Carlton has only adequately alleged that he is "regarded as" disabled and not that he has an "actual" or "record of" disability— as explained below—evidence on accommodations is not relevant to this case.

### C.  "Disability" Within the Meaning of the ADA

"To obtain relief under the ADA," an employee is "required to show that he was a disabled person within the meaning of the ADA, was qualified to perform the essential functions of his job, and suffered an adverse employment action because of his disability." *Finan v. Good Earth Tools,*

*Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) (citation omitted). Carlton contends that he can recover because he was disabled within the meaning of the ADA, qualified to perform the essential functions of his job, and terminated because of his disability. Filing 1 at 12–13 (¶¶ 64–65, 67).

Carlton alleges that he is disabled under all three of the definitions in the ADA, *i.e.*, that he is "actually disabled," has a "record of disability," and was "regarded as disabled" by Union Pacific. Filing 1 at 12 (¶¶ 63–64). Carlton alleges that his "seizure disorder" is the impairment that constitutes a disability under the ADA. Filing 10 at 19. Union Pacific argues instead that Carlton has not sufficiently alleged "actual" or "record of" disability but seems to concede that Carlton has alleged that he is "regarded as" having a disability. Filing 7 at 20; Filing 13 at 7 ("Carlton's claim is nothing more than a 'regarded as' disability claim."). Thus, the Court turns to the question of whether Carlton has sufficiently alleged that he is "disabled" within the meaning of the ADA.

### 1. *Statutory Definitions of Disability*

Disability discrimination is prohibited against "a qualified individual on the basis of disability" under the ADA. 42 U.S.C. § 12112(a). The ADA defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual ["actual" disability]; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). In addition, "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by" the ADA." 42 U.S.C. § 12102(4)(A).

Neither party disputes that Carlton alleged he is a "qualified individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* Filing 1 at 11 (¶ 57) ("Carlton remains capable of working as a Foreman General, as a Supervisor, and in all of his other

previous positions with Union Pacific to this day."). Thus, the issue is determining whether Carlton adequately alleged that he has a "disability" within the meaning of the ADA. The Court holds that Carlton failed to sufficiently allege that he has an "actual" or "record of" disability but adequately alleged that he was "regarded as" disabled by Union Pacific.

2. *Carlton's Allegations of Disability*

a. Carlton Has Not Adequately Alleged that He Has an Actual Disability

Carlton contends that he "has plausibly alleged that he has an 'actual' disability." Filing 10 at 16–17. Union Pacific responds that Carlton failed to allege facts sufficient to establish "actual" disability. Filing 7 at 20–21. Actual disability requires "[1] a physical or mental impairment [2] that substantially limits [3] one or more major life activities of such individual." 42 U.S.C. § 12102(1) (bracketed numbering added).

i. Carlton Has Not Sufficiently Alleged that He Has a "Physical Impairment"

Carlton contends that "it is reasonable to infer" that "his seizures and shoulder surgery" are "physical impairments within the meaning of the ADA." Filing 10 at 19. As evidence, Carlton cites his allegations in the Complaint that "he experienced two seizures and a resulting rotator cuff injury, for which he sought medical treatment." Filing 10 at 19. Union Pacific responds that Carlton "cannot meet th[e] baseline requirement" of alleging a physical impairment "because he failed to "mention[ ] anything about any specific impairment." Filing 7 at 20. Union Pacific asserts that Carlton has only "vaguely assert[ed] he is 'an individual with a disability.'" Filing 7 at 20. The Court agrees with Union Pacific.

Although the ADA statute does not define "physical impairment," the Eighth Circuit has endorsed an EEOC definition: "Any physiological disorder or condition, cosmetic disfigurement,

or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016) (quoting 29 C.F.R. § 1630.2(h)(1)). In addition, "[t]he ADA prohibits an employer from discriminating against an individual on the basis of a presently existing 'physical impairment.'" *Id.* at 1113. Carlton wants the Court to infer that a propensity to have seizures is a "physiological disorder or condition . . . affecting one or more body systems, such as neurological" that is "presently existing." *Id.* at 1108, 1113; Filing 10 at 19 ("Carlton's alleged seizure disorder would substantially limit . . . the operation of his neurological function."). The Court will not make this inference.

This case is similar to *Scheffler v. Dohman*, 785 F.3d 1260 (8th Cir. 2015), where the Eighth Circuit affirmed the district court's dismissal of a disability discrimination claim under the ADA:

> Scheffler failed to allege facts that would support that he has a disability as defined by the ADA, and therefore the district court correctly granted the motion to dismiss for failure to state a claim. [The plaintiff] does not claim to actually be an alcoholic or that his alcoholism causes him to be substantially limited in a major life activity. However, as the district court correctly found, "[d]riving while intoxicated on multiple occasions does not, in and of itself, establish that [Scheffler] is an alcoholic." Additionally, there is no allegation in the complaint that Scheffler has ever been diagnosed as an alcoholic, nor does the complaint allege that Scheffler suffers from a substantial limitation to a major life activity due to alcoholism.

*Scheffler*, 785 F.3d at 1261 (citation omitted). Like Scheffler, Carlton does not "claim to actually have" a seizure disorder. *Id.* Instead, Carlton alleges that a Union Pacific doctor wrote in his FFD Memo that "Carlton was evaluated 'for return to work clearance for rotator cuff repair when he was discovered to have new onset seizure disorder.'" Filing 1 at 9–10 (¶ 45). The Court will not infer that Carlton's two seizures constitute a present seizure disorder, absent any allegations that

12

he actually has the impairment, because having a seizure "on multiple occasions does not, in and of itself, establish that" Carlton has a disorder. *Scheffler*, 785 F.3d at 1261. Like in *Scheffler*, "there is no allegation in the complaint that [Carlton] has ever been diagnosed" with a seizure disorder, "nor does the complaint allege that [Carlton] suffers from a substantial limitation to a major life activity due to" a seizure disorder. *Id.* Accordingly, Carlton's "factual allegations lack[ ] enough specificity" to sufficiently allege that he has a present physical impairment. See *Richardson*, 2 F.4th at 1068.

> ii. Carlton Has Not Adequately Alleged a "Substantial Limitation" to a "Major Life Activity"

Carlton argues that "[i]t is reasonable to infer from Carlton's continued use of anti-seizure medication prescribed by a doctor that, without such medication, Carlton's alleged seizure disorder would substantially limit at least one major life activity, e.g., the operation of his neurological function." Filing 10 at 19. Carlton contends this inference would be "reasonable" because "[n]ot only must this Court accept all of Carlton's allegations as true and draw all reasonable inferences in his favor, this Court also must follow the ADA's directive to construe the statute as broadly as possible in favor of coverage." Filing 10 at 19. Union Pacific responds that Carlton "fails to allege anywhere in the Complaint that he is substantially limited in any major life activity." Filing 7 at 20. Union Pacific argues that "[w]hile Carlton's Complaint arguably includes some reference to 'impairments,' it does not at all allege if and how he is substantially limited in a major life activity." Filing 13 at 9. Union Pacific also contends that Carlton's allegation that "his physicians released him to work with no restrictions" belies the claim that he is substantially limited in a major life activity. Filing 13 at 9. The Court agrees with Union Pacific.

The ADA provides "Rules of construction" for the term "substantially limit." 42 U.S.C. § 12102(4)(B)–(E). The term "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," usually called the ADAAA. 42 U.S.C. § 12102(4)(B); *see also Morriss*, 817 F.3d at 1110 (noting that "in the ADAAA . . . Congress expressed an intent to provide 'broad coverage' of individuals with disabilities"). To "substantially limit one major activity," an impairment "need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Finally, courts do not consider "the ameliorative effects of mitigating measures such as [ ] medication" or other aids to determine whether an impairment substantially limits any major life activity. 42 U.S.C. § 12102(4)(E). The EEOC has elaborated that "'substantially limits' is not meant to be a demanding standard" and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(i), (iii). However, "not every impairment will constitute a disability within the meaning of this section." *Id.* § 1630.2(j)(ii). "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual . . . as compared to most people in the general population," and this "comparison . . . usually will not require scientific, medical, or statistical analysis." *Id.* § 1630.2(j)(ii), (v). Ultimately, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *Id.* § 1630.2(j)(iv).

The ADA also provides a non-exhaustive list of "major life activities," including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth,

14

digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B). EEOC regulations have elaborated that "the term 'major' shall not be interpreted strictly to create a demanding standard for disability. Whether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2) (citation omitted).

The Court will not infer that "without [anti-seizure medication], Carlton's alleged seizure disorder would substantially limit . . . the operation of his neurological function." Filing 10 at 19. Carlton does not allege any facts from which one could infer that his seizure disorder substantially limits his neurological function "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Carlton alleges that his "doctors prescribed [him] anti-seizure medication [and] Carlton has taken anti-seizure medicine since that time . . . and has not experienced another seizure." Filing 1 at 8 (¶¶ 36–37). Presumably, Carlton wants the Court to infer that any unmedicated seizure disorder would substantially limit the operation of a person's neurological function, but he does not allege that the anti-seizure medication is a "mitigating measure"—*i.e.*, that Carlton would have more seizures without the medication. *Cf.* 42 U.S.C. § 12102(4)(E). Indeed, Carlton asserts that he "had no prior history of seizures before these two seizures." Filing 1 at 8 (¶ 37). It would be untenable for the Court to infer that Carlton would have had more seizures but for taking anti-seizure medicine when Carlton has only ever had two seizures and does not allege that he was diagnosed with a seizure disorder. Carlton has simply failed to plead sufficient facts to allow the Court to make the required "individualized assessment" to determine "whether an impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(iv).

The Court will also not infer a substantial limitation because other factual allegations in Carlton's complaint contradict the notion that his neurological function is substantially limited.

15

Carlton alleges that his neurologist cleared him to return to work without restrictions approximately three months after his second seizure. Filing 1 at 9 (¶ 38). Carlton's claim that he received medical clearance over seven years ago belies any inference that his neurological function is presently and substantially limited. In addition, Carlton alleges that he "could perform the essential functions of his position with or without reasonable accommodations." Filing 1 at 13 (¶ 65). Absent specific allegations to the contrary, the Court will not infer that Carlton presently suffers a physical impairment that substantially limits his neurological function yet "remains capable of working . . . in all of his other previous positions with Union Pacific to this day" without any accommodations. Filing 1 at 11 (¶ 57). Because there are insufficient facts from which the Court can infer that Carlton's alleged seizure disorder substantially limits a major life activity, and because such an inference contradicts his other allegations, the Court holds that Carlton has not sufficiently alleged "actual" disability. Carlton's "[m]ere conclusory statements" that he has an "actual" disability "are insufficient to support a reasonable inference that the defendant is liable." *Richardson*, 2 F.4th at 1068.

> b. Carlton Has Not Sufficiently Alleged That He Has a "Record Of" Disability

Carlton contends that he "has plausibly alleged that he has . . . [a] 'record of' disability." Filing 10 at 16–17. Carlton states that "it is reasonable to infer" that "his seizures and shoulder surgeries" are "physical impairments within the meaning of the ADA." Filing 10 at 19. He also argues that "without [anti-seizure] medication, Carlton's alleged seizure disorder would substantially limit at least one major life activity, *e.g.*, the operation of his neurological function." Filing 10 at 19. Union Pacific responds that Carlton failed to allege facts sufficient to establish a "record of" disability. Filing 7 at 20. Union Pacific argues that Carlton failed to "mention[ ]

16

anything about any specific impairment" and "only vaguely asserts he is 'an individual with a disability.'" Filing 7 at 21.

The definition of disability under the ADA includes "a record of such an impairment." 42 U.S.C. § 12102(1)(B) (referring to "actual" disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual" (citing 42 U.S.C. § 12102(1)(A))). The Eighth Circuit has explained that "[h]aving a record of a qualifying impairment means that an employee 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 961 (8th Cir. 2000) (quoting 29 C.F.R. § 1630.2(k)); *see also Shklyar v. Carboline Co.*, 616 F. Supp. 3d 920, 924 (E.D. Mo. 2022) (quoting *Taylor*, 214 F.3d at 961), *aff'd*, No. 22-2618, 2023 WL 1487782 (8th Cir. Feb. 3, 2023). Thus, like under § 12102(A) ("actual" disability), Carlton must show that he previously had or was misclassified as having an impairment that substantially limits a major life activity.

Here, unlike his "actual" disability claim, Carlton's claim that he has a "record of" disability is not directly contradicted by other allegations that he is presently medically cleared to work without restrictions or that he can now return to his former position without any accommodations. There are also some facts from which the Court can draw inferences related to Carlton's alleged record of disability. For example, Carlton's doctors issued him "a temporary 30-day driving restriction" after his first seizure in February, 2016. Filing 1 at 8 (¶ 33). Carlton also alleges that there was an approximately three-month period after his second seizure during which he was not cleared by his doctors to return to work. Filing 1 at 8–9 (¶¶ 35, 38). Finally, he sought medical treatment and was hospitalized after his seizures. Filing 1 at 8 (¶¶ 33, 35).

17

However, even though his claim is not wholly inconsistent with the rest of his Complaint, Carlton still fails to allege that he had a physical impairment that substantially limited a major life activity. Thus, the Court will not infer that Carlton's two seizures constitute a "record of" substantial limitation to the major life activity of "neurological function," absent any factual allegations. *Scheffler* is again instructive:

> Scheffler argues his multiple DWI convictions create a record of alcoholism under the second prong of the disability definition. However, as the district court correctly found, "[d]riving while intoxicated on multiple occasions does not, in and of itself, establish that [Scheffler] is an alcoholic." Additionally, there is no allegation in the complaint that Scheffler has ever been diagnosed as an alcoholic, nor does the complaint allege that Scheffler suffers from a substantial limitation to a major life activity due to alcoholism. Accordingly, he has failed to allege that he is disabled under the ["record of"] prong of the ADA's disability definition.

*Scheffler*, 785 F.3d at 1261–62 (citation omitted). The inference Carlton seeks is inappropriate because having had seizures "on multiple occasions does not, in and of itself, establish that" Carlton had a record of a seizure disorder. *Scheffler*, 785 F.3d at 1261. Like in *Scheffler*, as discussed above, "there is no allegation in the complaint that [Carlton] has ever been diagnosed" with a seizure disorder, "nor does the complaint allege that [Carlton] suffers from a substantial limitation to a major life activity due to" a seizure disorder. *Id.* Therefore, Carlton also "failed to allege that he is disabled under the ['record of'] prong of the ADA's disability definition." *Id.* at 1262.

Even though Carlton does not assert that a seizure disorder substantially limits any major life activity other than his neurological function, the Court will consider whether he has alleged facts sufficient to infer any other substantial limitation. The major life activity that most closely mirrors his complaint is "working." 42 U.S.C. § 12102(2)(A). Carlton was not medically cleared by his own doctors to return to work without restrictions for approximately three months, which

suggests that his ability to work might have been substantially limited. Filing 1 at 9 (¶¶ 35, 38).

However, Carlton does not allege that his ability to work was ever restricted; instead, he asserts

that he "remains capable of working as a Foreman General, as a Supervisor, and in all of his other

previous positions with Union Pacific to this day." Filing 1 at 11. Because Carlton does not allege

that he ever lost the capability to work, the Court will not infer that an impairment substantially

limited his major life activity of "working." Accordingly, Carlton has not alleged sufficient

"factual content that allows the court to draw the reasonable inference that" Carlton has a "record

of" disability. *Christopherson*, 33 F.4th at 499 (quoting *Iqbal*, 556 U.S. at 678).

c.  Carlton Has Sufficiently Alleged that He is "Regarded As" Disabled by Union Pacific

In his Complaint, Carlton cited the three definitions of disability—actual, record of, and

regarded as—under the ADA and alleged that "[a]t all relevant times, [he] was an individual with

a disability as defined by the ADA." Filing 1 at 12 (¶¶ 63–64). Union Pacific appears to concede

that Carlton claimed that he was "regarded as" disabled. Filing 13 at 7 ("Carlton's claim is nothing

more than a 'regarded as' disability claim.")

Under the ADA, the definition of "disability" includes "being regarded as having such an

impairment [that substantially limits one or more major life activities]." 42 U.S.C. § 12102(1)(C).

The statute explains further that "[a]n individual meets the requirement of 'being regarded as

having such an impairment' if the individual establishes that he or she has been subjected to an

action prohibited under this chapter because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life activity." 42

U.S.C. § 12102(3)(A). The Eighth Circuit has explained that an employee "is regarded as disabled

if her employer mistakenly believes that she has a physical impairment that substantially limits

19

one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021) (citing *Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001)); *see also Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016) ("[A]s a threshold matter, [a plaintiff is] required to show that [the employer] perceived his [alleged disability] to be a condition that met the definition of 'physical impairment.'").

Although Carlton does not adequately allege an "actual" disability, as discussed above, his allegations show a "perceived physical . . . impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Union Pacific "imposed . . . work restrictions on Carlton on the basis that he was at risk for sudden incapacitation" despite Carlton's allegation that he "remains capable of working as a Foreman General, as a Supervisor, and in all of his other previous positions with Union Pacific to this day." Filing 1 at 10–11 (¶¶ 46, 57). Carlton also alleges that "Union Pacific did not allow Carlton to return to a Foreman General I position" or "to return to work in a different position" because of work restrictions imposed in response to what Union Pacific described as a "new onset seizure disorder" Filing 1 at 10–11 (¶¶ 44, 55–56). Accordingly, because Carlton does not allege that he has an impairment but that he was nonetheless removed from service due to an "alleged seizure disorder," he sufficiently alleges that Union Pacific "mistakenly believes that [Carlton] has a physical impairment that substantially limits one or more major life activities." *Canning*, 995 F.3d at 615; Filing 10 at 19. In short, Carlton's "nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that" he is "regarded as" disabled by Union Pacific. *See Mitchell*, 28 F.4th at 895 (quoting *Iqbal*, 556 U.S. at 680-83).

20

Therefore, Carlton has sufficiently alleged that he is "a qualified individual" within the meaning of the ADA because he was "regarded as" disabled by Union Pacific, but not because he had an "actual" or "record of" disability. 42 U.S.C. § 12112(a). Any claim based upon Carlton having an "actual" or "record of" impairment is dismissed.

### D.  The Nature of Count II

### 1.  *Contrary to Union Pacific's Contention, Count II Is Not for Disparate Impact*

Count II of the Complaint seeks relief for disability discrimination under 42 U.S.C. § 12112(b)(6). Union Pacific contends that Count II does not allege disparate treatment and "is actually a disparate *impact* claim." Filing 7 at 5 (emphasis in original). In this section, the Court will only discuss whether Carlton has attempted to plead disparate treatment or disparate impact. The plausibility of Carlton's claims will be discussed in a subsequent section.

Union Pacific argues that Carlton seeks "to disguise the claim as a disparate impact claim to avoid the statute of limitations" through "artful pleading." Filing 7 at 5; Filing 13 at 1. Carlton responds that Count II is a disparate-treatment claim because it asserts that Union Pacific's FFD evaluation program and other unwritten policies "intentionally screen[ed] him out of his job because of disability." Filing 10 at 5. The Court agrees with Carlton that Count II attempts to state a disparate-treatment and not a disparate-impact claim.

The "[g]eneral rule" for disability discrimination under the ADA is that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Section 12112(b)(6) specifies that "discriminat[ing] against a qualified individual on the basis of disability" includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability[.]" Count II specifically

seeks relief on a disparate-treatment theory of liability for disability discrimination under § 12112(b)(6). Filing 1 at 13–14 (¶¶ 70–75).

The Supreme Court has "consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact." *Raytheon Co v. Hernandez*, 540 U.S. 44, 52 (2003). "Both disparate-treatment and disparate-impact claims are cognizable under the ADA," but the claims are distinct. *Id.* at 53. Accordingly, the Supreme Court admonished that "courts must be careful to distinguish between these theories." *Id.*

The Supreme Court explained that "disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic." *Id.* (cleaned up). Disparate-treatment claims require "evidence of the employer's subjective intent to discriminate" and "depend on whether the protected trait . . . actually motivated the employer's decision." *Id.* at 52–53 (cleaned up). The Eighth Circuit has elaborated: "In a disparate treatment case, the plaintiff must basically prove that he is a member of a protected class and that the defendant treated him less favorably than similarly situated non-minority employees in circumstances from which intentional discrimination can be inferred." *Hervey v. City of Little Rock*, 787 F.2d 1223, 1231 (8th Cir. 1986). The prima facie case for disparate treatment based on disability requires showing "(1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) a causal connection between an adverse employment action and the disability." *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 544 (8th Cir. 2018) (cleaned up).

22

Unlike disparate-treatment claims, disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Raytheon*, 540 U.S. at 52. "The factual issues, and therefore the character of the evidence presented, differ [from disparate-treatment claims] when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes." *Id.* at 53 (cleaned up). Disparate-impact claims do not require showing that "the protected trait . . . actually motivated the employer's decision." *Id.* at 52 (internal quotations and citation omitted). Instead, "a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case." *Id.* at 52–53 (cleaned up). The Eighth Circuit elaborated that "[t]o satisfy the elements of a prima facie disparate impact claim, plaintiffs must demonstrate: "(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040 (8th Cir. 2018).

Here, Carlton did not assert that there was a "facially-neutral personnel policy or practice," as required to assert a disparate-impact claims. *Williams*, 901 F.3d at 1040. To the contrary, Carlton asserted "intentional discrimination" due to what he alleged were "facially discriminatory standards, employment tests, and/or other selection criteria . . . that are intended to screen out individuals with disabilities, and which did screen out Carlton." *Hervey*, 787 F.2d at 1231; Filing 1 at 14 (¶ 72). Thus, Carlton alleged Union Pacific's "subjective intent to discriminate," which is consistent with a disparate-treatment claim. *Raytheon*, 540 U.S. at 53. Therefore, Carlton attempted to state a disparate-treatment claim and not a disparate-impact claim. Because Union Pacific does not argue that Carlton is time-barred from raising a disparate-treatment claim, and

that is the kind of claim the Court finds Carlton attempts to assert in Count II, the Court need not analyze whether the statute of limitations would bar a disparate-impact claim.

### 2. The Court Does Not Need to Determine Whether Disparate-Treatment Claims Are Legally Cognizable Under § 12112(b)(6)

Union Pacific argues that 42 U.S.C. § 12112(b)(6) is for disparate-impact claims only. Filing 13 at 1–5. Union Pacific contends that controlling precedent fairly implies that § 12112(b)(6) is for disparate-impact claims alone. Filing 13 at 2–3. In addition, Union Pacific refers the Court to previous dicta from another Judge on this Court and persuasive authority from other District Courts and Courts of Appeals to support its contention. Filing 13 at 3. Ultimately, Union Pacific asks the Court to "follow the many courts that have refused to extend § 12112(b)(6) to a disparate treatment theory and dismiss Carlton's § 12112(b)(6) claim." Filing 13 at 5. Carlton responds that disparate-treatment claims are viable under § 12112(b)(6). He contends that no precedent from the Supreme Court or the Eighth Circuit holds nor implies that disparate-treatment claims are unavailable under § 12112(b)(6). Filing 10 at 6, 10–11. Carlton also argues that the Court's previous dicta on the issue was incorrect and refers the Court to persuasive authority that supports his argument. Filing 10 at 6–7, 12. In addition, Carlton asserts that § 12112(b)(6) permits disparate-treatment claims as a matter of statutory interpretation. Filing 10 at 9. However, because the Court determines that Carlton has failed to state a plausible claim for relief, the Court does not need to decide whether a disparate-treatment claim is cognizable under § 12112(b)(6).

### E. The Sufficiency of the Pleading of Count II

The Court now considers whether Carlton pleaded sufficient facts to state a plausible claim for disparate treatment, assuming that disparate-treatment claims are viable under § 12112(b)(6). Carlton contends that his Complaint "is sufficient to state a plausible claim that Union Pacific was

using its Fitness-for-Duty policies to intentionally screen him out of his job because of his disability," thereby alleging disparate treatment. Filing 10 at 14. Carlton argues that he alleged sufficient direct and indirect evidence to show that Union Pacific's practices constitute disparate treatment. Filing 10 at 14–16. Union Pacific responds that "even were Carlton able to assert a disparate treatment claim pursuant to § 12112(b)(6), he cannot allege facts sufficient to establish such a claim." Filing 13 at 7.

The Supreme Court and the Eighth Circuit have "long recognized that a party may prove intentional discrimination under the ADA either by direct or indirect evidence." *Lipp*, 911 F.3d at 543 (internal quotations and citations omitted); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015). Therefore, the Court must consider whether Carlton has sufficiently alleged facts that can serve as direct or indirect evidence of disparate treatment. The Court agrees with Union Pacific that he has not.

### 1. *Carlton Has Not Sufficiently Alleged Direct Evidence of Disparate Treatment*

Carlton contends that he has alleged sufficient direct evidence of intentional discrimination to plausibly state a claim for disparate treatment. Filing 10 at 14. Carlton refers the Court to the FFD policy and other unwritten practices including the "1% rule" as examples of direct evidence. Filing 10 at 14–15. Carlton asserts these policies can serve as direct evidence of disparate treatment because they are "facially discriminatory." Filing 10 at 14. Union Pacific responds that Carlton cannot show that the policies are facially discriminatory because they apply "to all employees, regardless if they have a disability" and some employees with disabilities "are returned to work." Filing 13 at 7.

The Supreme Court has stated that "a plaintiff can prove disparate treatment . . . by direct evidence that a workplace policy, practice, or decision relies expressly on a protected

25

characteristic." *Young*, 575 U.S. at 213. This Court concludes that a policy that "relies expressly" on disability classifies by disability, *i.e.*, such a policy is facially discriminatory. *Id.* The Eighth Circuit has defined "direct evidence" somewhat differently as evidence "which shows a strong causal connection between the alleged discriminatory animus and the adverse employment action." *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727 (8th Cir. 2023). For example, the Eighth Circuit has explained that "[d]irect evidence can be circumstantial in nature and includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Id.* (internal quotations and citation omitted). The evidence "must be sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* (internal quotations and citation omitted).

Carlton alleges that Union Pacific's policies are "facially discriminatory," by which the Court understand him to mean that the policies "rel[y] expressly" on disability and thus serve as direct evidence of disparate treatment. Filing 1 at 14 (¶ 72); Filing 10 at 14–15; *Young*, 575 U.S. at 213. However, Carlton never argues that he has "direct evidence" of the sort described by the Eighth Circuit in *Smothers*, because he nowhere alleges that there is evidence "circumstantial in nature" such as "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Id.* (internal quotations and citation omitted). Union Pacific argues that its policies are not facially discriminatory because they apply "equally to all employees [with and] without disabilities" and because some employees "who have a disability are subject to a lawful fitness-for-duty review and returned to work, meaning the policy does not automatically result in 'discrimination.'" Filing 7

26

at 11. Thus, the Court will examine the FFD policy and the "1% rule" to determine whether each policy "expressly relies on" disability.

a. The FFD Policy Cannot Serve as Direct Evidence of Disparate Treatment

The Court begins with Carlton's allegations that the FFD policy can serve as direct evidence of disparate treatment. The FFD policy aims to determine employees' "[a]bility to medically and functionally (including physical, mental, and/or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws." Filing 1-1 at 2 (cleaned up). The FFD policy applies to "all Union Pacific employees across the county." Filing 1 at 3 (¶ 9). After the FFD evaluation, HMS determines whether "the employee is fit for duty, fit for duty with restrictions, or unfit for duty." Filing 1 at 5 (¶ 17). The policy imposes several requirements on employees:

Reporting to work fit for duty to safely perform their jobs with or without reasonable accommodations;

Notifying the supervisor when the employee becomes aware of or is concerned that a medical condition or symptom(s) exists which may affect his/her ability to safely perform his/her job;

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS;

Providing, upon request, information from the employees [sic] health care provider including, but not limited to: medical documentation pertaining to medical tests, examinations, and/or evaluations, including lists of all prescription and over-the-counter medications taken by the employee. Employee may be required to provide information on a periodic basis for monitoring of continued fitness-for-duty.

Providing, upon request, a statement from the employees [sic] healthcare provider whether or not, or in what circumstances, any prescriptions or OTC medications

27

currently taken by the employee is likely to impair the employee's perceptual abilities or alertness, or impair mental or physical functioning;

Performing all work in conformance with any medical restrictions that HMS has placed upon the employee;

Meeting the requirements, in a timely manner, of all federal and state laws and regulations applicable to the employee with regard to medical evaluations and testing and the use of personal protective equipment;

Providing accurate information to Health and Medical Services regaring [sic] health status and medical treatment;

. . .

Notify HMS as soon as practicable if he/she experiences any of the health events listed in Appendix B of these Medical Rules. A reportable health event is defined as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea;

The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.

If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS[.]

Filing 1-1 at 3 (semicolons added).

As to whether anything on the face of the FFD policy "relies expressly" on disability, *i.e.*, whether the policy is "facially discriminatory," *Young*, 575 U.S. at 213, the Court finds that nothing in the FFD policy that expressly relies on or classifies by "disability." *See generally* Filing 1-1. Indeed, Carlton does not specify which part of the FFD policy he believes expressly relies on disability. On the other hand, the FFD policy states that "[i]f the employee experiences a [reportable] health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS." Filing 1-

1 at 3. It also lists as "reportable health events" medical conditions such as diabetes, a "seizure of any kind," heart attacks, and "[n]ew use of hearing aids." Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep Apnea"). Consequently, the Court considers whether "reportable health event" operates as a stand-in for "disability" such that the classification in the FFD "expressly relies" on disability.

The Court finds that the FFD's reliance on "reportable health events" does not "expressly rely" on disability and is not "facially discriminatory." *Young*, 575 at 213. Instead, employees who have a "condition" that constitutes a "reportable health event" may not have an "impairment" that constitutes a "disability" within the meaning of the ADA. *Compare* 42 U.S.C. § 12102(1)(a) (defining disability to mean an "impairment that substantially limits one or more major life activities"), *with* Filing 1-1 at 13. For example, an employee who had a "seizure of any kind" nonetheless might not have a disability" within the meaning of the ADA if he is not "substantially limit[ed] [in] one or more major life activities." Filing 1-1 at 13; 42 U.S.C. § 12102(1)(a); *see also* Filing 1 at 13 (¶ 65) (despite having suffered two seizures, Carlton alleges that "[a]t all relevant times, [he] had the requisite skill, experience, education, and other job-related requirements of his position [and] could perform the essential functions of his position with or without reasonable accommodations"). In addition, there may be employees with an ADA-defined disability who have never experienced a "reportable health event." For instance, not a single "mental impairment" that "substantially limits one or more major health activities of such individual" would fall under any category of "reportable health events." *Compare* 42 U.S.C. § 12102(1)(a), *with* Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep

Apnea"). Thus, the FFD policy is not facially discriminatory because classifying employees by "reportable health events" is not the same as classifying them by disability. Therefore, the FFD policy does not rely expressly on disability.

In sum, the FFD policy does not "rel[y] expressly" on disability. *Young*, 575 U.S. at 213. Rather, the FFD evaluations "lead[ ] to varying—and individualized—outcomes" for individuals with and without disabilities. *Harris*, 953 F.3d at 1037. Therefore, Carlton's "[m]ere conclusory statements" that the FFD policy can serve as direct evidence of disparate treatment are insufficient. See *Richardson*, 2 F.4th at 1068.

> b. The "1% Rule" Cannot Serve as Direct Evidence of Disparate Treatment

The Court moves next to allegations that Union Pacific's "other unlawful policies and qualification standards related to Fitness-for-Duty that are not included within the Medical Rules" are direct evidence of disparate treatment. Filing 10 at 15. These "unlawful policies"[3] include the purported "1% rule," which "disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation." Filing 1 at 4 (¶ 12). Accepting as true Carlton's allegation that Union Pacific uses this "1% rule," the Court holds that the "1% rule" does not constitute direct evidence of disability discrimination.

The "1% rule" does not "expressly rel[y] on" disability because the risk of future impairments does not constitute a presently existing impairment under the ADA. *Young*, 575 U.S.

---

[3] Carlton contends that "Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for-Duty that are not included within the Medical Rules," and this is also direct evidence of disability discrimination. Filing 1 at 4 (¶ 12); Filing 10 at 15. One protocol that Carlton alleges that Union Pacific relied on in making his FFD determination was the "1% Rule." Filing 10 at 15. Carlton also alleges that "Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not 'normal,' based on an indication that the employee may have a cardiac condition, however minor." Filing 1 at 4 (¶ 12). However, Carlton does not allege that he was subjected to this tolerance testing or that he has a cardiac condition. Therefore, the Court only considers the "1% rule."

at 213. At first glance, risk of sudden incapacitation may appear to qualify as a disability under the ADA. This is so, because the ADA includes as a "disability" an "impairment that is episodic or in remission . . . if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Moreover, incapacitation would likely substantially limit most of the major life activities listed in 42 U.S.C. § 12102(2)(A). However, the focus of the "1% rule" is the future risk of incapacitation, not "a presently existing 'physical impairment' as that term is defined under the Act." *Morriss*, 817 F.3d at 1113. The Eighth Circuit explained that the ADA does not prevent discrimination against risk of future impairments, so long as the risk determination is not based on a presently existing impairment:

> The ADA prohibits an employer from discriminating against an individual on the basis of a presently existing "physical impairment" as that term is defined under the Act. But the ADA does not prohibit an employer from acting on some other basis, *i.e.,* on its assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment. . . . The ADA does not prohibit discrimination based on a perception that a physical characteristic—as opposed to a physical impairment—may eventually lead to a physical impairment as defined under the Act. Instead, the plain language of the ADA prohibits actions based on an existing impairment or the perception of an existing impairment.

*Morriss*, 817 F.3d at 1113. Thus, the question is not whether a future risk of sudden incapacitation is a physical impairment, but whether Union Pacific decides that an employee is at such risk because of a "presently existing 'physical impairment.'" *Id.* In other words, the "1% rule" does not "expressly rel[y] on" disability because a future risk of sudden incapacitation is not an impairment under the ADA. *Young*, 575 U.S. at 213. Carlton's "[m]ere conclusory statements" regarding the FFD policy or the "1% rule" "are insufficient to support a reasonable inference that" the policies can serve as direct evidence of disparate treatment. *Richardson*, 2 F.4th at 1068.

2.  *Carlton Has Not Alleged Sufficient Indirect Evidence from which a Reasonable Person Could Infer Disparate Treatment Because of Disability*

Carlton also claims that he has alleged sufficient indirect evidence of disparate treatment to state a plausible claim. Filing 10 at 15–16. Carlton argues that "there is no requirement that [he] prove the alleged policies are 'facially discriminatory'" but only that "the evidence in the complaint, when accepted as true, is sufficient to state a plausible claim that Union Pacific was using its Fitness-for-Duty policies to intentionally screen him out of his job because of his disability." Filing 10 at 13–14 (emphasis omitted). By this, the Court understands Carlton to argue that the Complaint also contains factual allegations which can serve as indirect evidence of disparate treatment. Carlton contends that it is reasonable to infer that Union Pacific intentionally discriminated against him from his allegations that Union Pacific did not conduct an individualized Fitness-for-Duty evaluation, that Union Pacific disregarded the opinions of his treating medical providers, and that Union Pacific continued to rely on the flawed FMCSA. Filing 10 at 16. The Court will also consider whether the "1% rule" constitutes indirect evidence because Carlton alleges Union Pacific instituted the rule in reliance on the FMCSA Handbook. Filing 1 at 7 (¶ 27). Union Pacific does not specifically address Carlton's claim that indirect evidence shows disability discrimination, but Union Pacific contends generally that Carlton "cannot allege facts sufficient to establish [a disparate-treatment] claim." Filing 13 at 7.

A plaintiff may "show disparate treatment through indirect evidence . . . through application of the *McDonnell Douglas* framework," which first "requires a plaintiff to make out a prima facie case of discrimination." *Young,* 575 U.S. at 228. Making out the prima facie case requires "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory

criterion." *Id.* The Eighth Circuit has elaborated on the elements of a prima facie discrimination

claim based on indirect evidence:

> Under the *McDonnell Douglas* framework, [an employee must show] the first three
> elements of a prima facie case of discrimination: (1) she is a member of a protected
> class; (2) she was qualified for her position and performing adequately; and (3) she
> suffered adverse employment actions. . . . [T]he fourth element [requires a] showing
> that the circumstances of these actions gave rise to an inference of discrimination.
> She may do so by presenting evidence of pretext. A plaintiff may show pretext,
> among other ways, by showing that an employer (1) failed to follow its own
> policies, (2) treated similarly-situated employees in a disparate manner, or (3)
> shifted its explanation of the employment decision.

*Smothers*, 63 F.4th at 728 (internal quotations and citation omitted).

Here, Carlton has satisfied the first three elements of his prima facie case for disability

discrimination. As discussed above, he is "regarded as" having a disability. 42 U.S.C.

§ 12102(1)(C). He alleged that he "had the requisite skill, experience, education, and other job-

related requirements of his position, could perform the essential functions of his position with or

without reasonable accommodations, and was therefore a qualified individual under the ADA."

Filing 1 at 13 (¶ 65). He also alleged that he was "remov[ed] . . . from service." Filing 1 at 13 (¶

67). Thus, the question is whether Carlton can satisfy the fourth element by "showing that the

circumstances of" relying on the FMCSA Handbook and on Carlton's medical records without an

individual medical examination "gave rise to an inference of discrimination." *Smothers*, 63 F.4th

at 728. The Court will consider whether either of these actions "present[ ] evidence of pretext." *Id.*

Carlton does not allege that Union Pacific "failed to follow its own polices" or "shifted its

explanation of the employment decision." *Id.* Therefore, the focus of the "pretext" analysis is

whether Union Pacific "treated similarly-situated employees in a disparate manner," *i.e.*, relied on

the FMCSA Handbook and on employees' medical records instead of their treating physician's

opinions or an individualized examination because Union Pacific wanted to exclude employees based on disability. *Id.*

The Court begins with the allegation that Union Pacific's reliance on the FMCSA Handbook can serve as indirect evidence of disparate treatment. The Court assumes that the Handbook, as Carlton alleged, "did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce." Filing 1 at 6 (¶ 23). The Court also assumes that, by 2015, Union Pacific knew "that the FMCSA removed the Handbook from its website and no longer endorsed its use" and that Union Pacific used the Handbook "as a basis to assign standardized work restrictions for its employees." Filing 1 at 6 (¶ 26). In addition, the Court assumes that the "1% rule" was instituted by Union Pacific in reliance on the FMCSA Handbook, as Carlton alleged. Filing 1 at 7 (¶ 27) ("Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions.").

First, regarding "circumstances of" reliance on the Handbook as purportedly "g[iving] rise to an inference of discrimination," *Smothers*, 63 F.4th at 728, Carlton only alleges the following:

> The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce. . . . In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website. . . . By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the

> Handbook from its website and no longer endorsed its use. . . . Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

Filing 1 at 6 (¶¶ 23–26). However, Carlton has adduced no evidence to plausibly suggest that using the standards in the Handbook is inappropriate simply because it was intended for a different industry. *See generally* Filing 1. The Court observes that Carlton alleges that the Handbook was designed for "drivers operating a commercial vehicle in interstate commerce," that is, designed for a plainly related transportation industry. Filing 1 at 6 (¶ 23). The heart of the issue is whether Union Pacific's reliance on the FMCSA Handbook "gave rise to an inference of discrimination" because it "treated similarly-situated employees in a disparate manner." *Smothers*, 63 F.4th at 728. In essence, Carlton wants the Court to hold that a reasonable person could "infer" that Union Pacific relied on safety standards from a federal agency concerning a related industry because it "more likely than not" intended to discriminate against disabled employees. *Young*, 575 U.S. at 228. Such an inference is simply not plausible, for the following reasons.

Carlton implies that Union Pacific relied on the Handbook as a "pretext" to discriminate against him and other disabled employees, *i.e.*, that Union Pacific relied on governmental safety information that was known to be "outdated" and intended for the commercial vehicle industry rather than the railroad industry so that Union Pacific could intentionally remove him from service. In effect, Carlton wants the Court to infer that: (1) Union Pacific adopted facially neutral[4] safety standards because it knew the standards would have the effect of disproportionately discriminating against disabled employees; (2) Union Pacific intended or desired this effect; (3) Union Pacific's

---

[4] Although Carlton alleges the FFD policy is "facially discriminatory," the Court rejected that argument in a preceding section. Filing 1 at 14 (¶ 72).

reasons for relying on federal safety standards were not because Union Pacific believed that the standards would serve to protect its employees from workplace hazards; (4) any safety rationale for relying on the FMCSA is a mere pretext for disability discrimination; and (5) the fact that the Handbook was intended for the trucking industry rather than the railroad industry and that the Handbook was taken off the FMCSA website is evidence that Union Pacific's reliance on the Handbook was pretext for intentional discrimination. The Court finds that this series of inferences is implausible.

Carlton also implies that the Court should require Union Pacific to contradict federal agency safety standards applicable to a related industry, which the Court is reluctant to do. *See Boersig v. Union Elec. Co.*, 219 F.3d 816, 822 (8th Cir. 2000) (noting that compliance with the employee's "argument would require an employer to accommodate a disabled employee by violating the express terms of a CBA"); Filing 1 at 14–15 (seeking "[a]n injunction against Union Pacific . . . from engaging in each of the unlawful practices, policies, customs, and usages set forth herein"). Moreover, if Carlton asserted that these standards merely have the effect (under a disparate-impact theory) of discriminating against Carlton and other disabled individuals, the Court would likely find his conclusion to the chain of inference more plausible. Instead, Carlton alleges that "it is reasonable to infer that Union Pacific intentionally discriminated against Carlton" by having these standards. Filing 10 at 16. The notion that Union Pacific would adopt federal safety standards because it intended to discriminate against disabled employees is too farfetched to be plausible.

The Court turns to the issue of determining whether Union Pacific's reliance on Carlton's medical records to conduct his FFD evaluation—instead of conducting its own examination of Carlton or adopting his doctors' opinions wholesale—constitutes indirect evidence of disparate

36

treatment. Filing 10 at 15–16. Carlton does not explain why relying on his medical records to conduct an FFD evaluation is indirect evidence of discrimination. Nor does Carlton explain why conducting its own individualized FFD evaluations or adopting the opinions of his doctors would instead be non-discriminatory. Instead, Carlton simply asserts that "it is reasonable to infer that Union Pacific intentionally discriminated against Carlton." Filing 10 at 16. The necessary inference here would be that relying on medical records alone allows Union Pacific so much discretion to impose restrictions based on disabilities as compared to conducting physical examinations or adopting the opinions of an employee's personal physician would be as to imply a discriminatory animus and demonstrate pretext. The Court also finds this allegation too removed from plausibility "to support a reasonable inference that the defendant is liable." *Richardson*, 2 F.4th at 1068. Therefore, Carlton has not sufficiently alleged any indirect evidence of disparate treatment.

In sum, neither Union Pacific's reliance on the FMCSA Handbook nor its reliance on Carlton's medical records are "actions taken by the employer from which one can infer . . . that it is more likely than not that such actions were based on a discriminatory criterion." *Young*, 575 U.S. at 228. Thus, even when making all possible inferences in favor of Carlton, the Court holds that he has not sufficiently alleged indirect evidence of disparate treatment because the "factual allegations lack[ ] enough specificity to raise a right to relief above the speculative level." *Richardson*, 2 F.4th at 1068. Therefore, because Carlton failed to plead either direct or indirect evidence of disparate treatment, his disparate-treatment claim is dismissed for failure to state a claim upon which relief can be granted.

## III. CONCLUSION

For these reasons, the Court dismisses Count II, Carlton's disparate-treatment claim under

42 U.S.C. § 12112(b)(6), even though the Court finds that Carlton attempted to allege disparate

treatment and not disparate impact. Count II must be dismissed because the Complaint fails to

plead facts sufficient to state a disparate-treatment claim upon which relief can be granted. In

addition, any claim that Carlton has an "actual" or a "record of" disability is dismissed. Any claim

based on a failure to accommodate is also dismissed. The Court also denies Carlton's Motion for

Oral Argument. Accordingly,

IT IS ORDERED:

1. Defendant's Motion to Dismiss, Filing 6, is granted; and

2. Plaintiff's Motion for Oral Argument, Filing 12, is denied.

Dated this 29th day of September, 2023.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge